The next case on the calendar is Hoskins v. Withers. This is 22-4081, and we'll hear from May it please the court and counsel, Kara Porter for Appellant Joseph Hoskins. I'm going to try to reserve four minutes, but of course we'll see. As the court knows, we're here due to the granting of a motion to dismiss our civil rights case. The trial judge found that neither the allegations nor the entirety of the body cam footage showed any constitutional violation. The court did not reach a second argument with respect to whether the law would have been clearly established, but instead ruled on constitutional issues. I thought it might be the best use of my time today to perhaps point out a few areas where we contend that what the trial court did was really more akin to fact-finding than to interpreting everything with a reasonable inference in our favor, including the video. So I just picked out a few, and then I'll just mention what they are and why they matter to the case. And of course, I'm going to skip the interesting legal issue about whether the Utah Tax Commission can regulate non-resident plates. We've briefed the heck out of that. And I'll go right into the dog, because the dog, the so-called dog sniff, which was more than that, but really sets, everything is like dominoes. If we are correct, as we've alleged and as we believe is a plausible viewing of that video, that the dog did not alert, which would make sense, of course, there were no drugs in the car. There was no drug paraphernalia in the car. If the dog did not alert, but in fact went around a couple of times, no alert, as the officer himself admitted later, no sit, and instead went back to his handler and then was given a command. They use little words that most of us don't know, like a foreign language or little code words. And then that was given, and then the dog went straight for the window. I thought it was a whistle. In the video, it sounds like it is some sort of a, we thought maybe it was more of a command type thing, but even different kinds of whistles can communicate to a dog, I mean a trained dog. The whistling went on throughout, right? It's to move the dog along. You know, we just believe that there was a separate, I mean it's our interpretation of the video, and obviously I would defer to how the court interprets it, but we believe there was something more distinct, a distinct thing, which explained why the dog pretty much did what it did after nothing. Does it matter since it's the second time that the dog tried to get in the car? I think it does, because what happened is the dog is not alerting until the dog comes back, and then is basically as alleged and as we believe is plausible in the video, essentially given a command or a direction to do something that looks like an alert. And it matters a lot in this case because if the dog handler had not been able to claim that there was an alert, then there would have been no probable cause for anything, no basis for continuing to hold the client. The money that was then later seized and he had to pay a lawyer to get his own money back when he was never charged, none of that would have happened. We also believe that it was a form of fact-finding when the court essentially concluded that there was no prolonging of the stop, that there was no arrest. Well, on the Rodriguez issue, the prolonging of the stop, how do you distinguish case? Well, in our, I mean in this case, the officer, I mean you can see this kind of in the video, the officer is taking his time and is not typing in and submitting a prompt. He's waiting for him to find his insurance. And I think under all of our case law, and tell me if I'm wrong, the officer can get a warrant check, check on the status of the license. Yes. Doesn't have to, you know, he can call it in. He calls it in promptly. He's waiting for the defendant to furnish his insurance. And while he's waiting for the status, see if there is any warrant, status of his license, waiting for the defendant to have, to find his insurance information, which is exactly what happened in Cates. The officer then calls for the canine, he does the canine stiff in Cates, he calls for another officer to do the canine stiff. And in Cates, we said that it wasn't prolonging the stop because the officer is still waiting in that case, you know, waiting for the defendant to find the information. In this case, he's actually further justification by waiting for the status of the warrant check. I think the main distinction there is the period of time before it was called in. We would contend that saying that it was promptly called in, you know, is not something that can be determined as a matter of law based on this motion to dismiss. There is a difference in timing as to, in the case that Your Honor is citing, in our case. Because in the other case, it was called in very quickly. Here, it appears to us from the body cam that it was not. Well, it's less than three minutes from the time that he approaches the car window until the time that he calls it in. Well, I understand that, but this court in 2022 said that even a prolonging of one minute. Well, but that's prolonging. We're talking about an officer, I don't know, is the officer supposed to sprint back to the car and type 90 words a minute? Three minutes seems like enough time to go up to the car, request information, find out some things, back to the patrol car, enter it in, send it to dispatch. That's not delaying. And I think some of the communication with dispatches actually can be done in terms of just like through a communication on the shoulder. Don't believe that that part has to be done in writing. But if I can turn to one that I think is more perhaps pressing in the case, and that is the trial court's conclusion that Mr. Hoskins was not arrested until after Cash had been found in his car. Remember, no drugs, no paraphernalia, but Cash was found in his car and it was wrapped. So the trial court concluded, no, in fact, I don't believe there's ever been an argument that there was any probable cause to arrest Mr. Hoskins prior to the finding of the money. We would submit, and we've argued that the, you know, carrying of legal tender in the United States is still legal, hence legal tender. But nonetheless, if a fact finder concluded that Mr. Hoskins was arrested earlier, then this case takes a whole other turn because no one's even arguing there was probable cause earlier. And our submission is, and specifically, particularly at the motion to dismiss phase, that having had a gun pointed at him, having been handcuffed, having been locked in the back of a car with no handles, having his phones confiscated, etc., it's not an unreasonable inference that an arrest had occurred at that point. But the trial court essentially, you know, well, ruled otherwise. I'm going to mention a couple of other fact things, and I really want to touch on the DNA because that is an interesting issue. But a couple of the other fact, essentially fact findings that we conclude, the court said that pointing, having an angry police officer pointing a gun at you after he did, it was a very vulgar phrase that he uttered, but First Amendment, that that was minor. It clearly didn't match any of the criteria of Graham in terms of, you know, the severity of the crime. There was no fleeing. A fact finder could conclude that a reasonable officer would not and that he did not believe there was any threat. He'd already been frisked, searched. Ah, frisked and frisked. I think he'd been patted down at that point. I'll take it back. He lifted his shirt. And that is true. And I think he did a turnaround, if I remember correctly, and saw the bare skin, which is, frankly, even better than a frisk. So he had shown him his, you know, again, that there's nothing in the waistband. How do you distinguish Henry versus Story? Can you give me an answer? Well, my memory is that we said in the presidential opinion that it's not excessive force under the Fourth Amendment to point a gun at somebody who was suspected of a serious crime. And he is a suspected at that time of criminal conspiracy and laundering money. Actually, he's not, because when the gun was pointed, remember, there hadn't been a search of the car. There had been no money found. So how could it be laundering money? So at the time the gun was pointed, and not coincidentally, right after he made that really crude, apparently very effective insult to the officer, that's before any of that, the only thing they had was the alleged dog sniff, which, again, we say the dog did not alert. And this court has said at least a couple of times, and we cited in the brief, that a suspicion even of drug trafficking is not enough to suspect that the person is violent. And here there had been cooperation. There had been everything up until the point where he was yelled at and shoved, and then he lost his temper. He didn't do anything physical. Can we move past the facts? 430 is all you've got left. And there are some important legal questions that I'd like clarification. I'm just going to ask two. Tell me on the liberty interest, are you contending it's the it's his DNA, or that the DNA wasn't destroyed, or that he wasn't notified that the DNA was destroyed? Which of those is the liberty interest? Well, and it's really also a privacy and property interest. I might even characterize it like that. Okay. And frankly, we don't have any way of knowing whether or not it was destroyed. That's our complaint. I'm asking, what's the liberty interest that you're claiming? Well, the liberty interest, I mean, I think we emphasize the privacy and property more than liberty. So I don't know. I would put my whole hat on liberty. Are you making a liberty claim? I don't know that I would with respect to DNA. I believe we don't need to, given this court and the Supreme Court precedent on privacy and property of your own DNA. Okay. And in a nutshell, I mean, an arrestee has their DNA taken. The statute contemplates that it is given to the state of Utah. Now, the state says, well, we don't necessarily know. But no notice is given with what's done with it. And then when no charges are brought, it's supposed to be destroyed. But under the statute, there literally is no way to verify it, compel it. Is that still true? Is that claim mooted by the 2022 Utah statute? No, I mean, we have our problems with the new statute. Doesn't it allow that? Doesn't it allow the very thing that you're claiming you were deprived of, the right to know that it had been destroyed? There are some other protections, et cetera, to it. It doesn't moot his individual claim, and it doesn't moot the claims of the others in his place before the statute. Why? Isn't he just as able right now to seek that information as before the statute was passed? In other words, it doesn't just apply to future violations, or does it? Except that it required a lawsuit to even get that. And I think there is case law, including from the Supreme Court, that if something requires a lawsuit, and it's voluntarily enacted by the same actor in response to the lawsuit, that that's not necessarily enough. But if I may, I would like to reserve the last two minutes, if that's all right. Sure. Thank you. May it please the Court, Cliff Peterson, Utah Attorney General's Office for the State Trooper. We believe that the district court correctly analyzed each phase of this encounter and properly concluded that no Fourth Amendment violation occurred. The initial stop was valid because the plate was indeed obscured. It was not clearly legible. The dog sniff did not prolong the stop. If you look carefully at the video and the time stamps, which are cited both by the other side and by us and by the district court, you can see the timeline there that the officer was still completing the valid mission of the stop under the black letter law, such as Rodriguez. Third, the indication slash alert, the judge, contrary to what they argued in their reply brief, the judge didn't presume to be a dog expert and interpret anything. The dog, the judge that looked at the videotape, it establishes historical facts. You can see the dog reacting. You can hear, in addition, the officer narrating. And that was basically the judge made a legal conclusion that it's reasonable for the officer here to interpret his dog's behavior, these dramatic changes, to show that the dog was indeed pursuing drug odor. And the actual arrest as well, we submit that that was validly determined by the district court because there was at least arguable probable cause at that point. Not just the large amount of money, but the fact that it was actually hidden. Well, counsel, can I just stop you there? I appreciate you going through the points, but on the arrest, help us understand how there was probable cause, I guess in your view, before the money was found. What you just stated was there was probable cause after the money was found. Correct. But how about before the money was found? Before the money was found, he was only being detained while they were pursuing the search. There was probable cause to search, so he was being detained. He was detained from 2.31 p.m. on. I mean, it was different stages, obviously. First, it was an initial stop, and it was the mission of the stop, but he remained detained. It was just whether there's more force, whether it was more intrusively detained. When he was told to stand by the mile marker post, he was still being detained while the search was ostensibly going to be carried out with him being able to observe from a safe distance. But even when he was handcuffed for officer safety, because there's several things on that, clearly, verbally, the suspect was escalating. I mean, he was beginning to use these profanities. The officer observed he was being evasive, and he was hiding his second cell phone. So given all of that, it was reasonable for this officer to perceive a potential safety issue, a potential danger here, especially when he turned. I mean, it makes sense here. I think the Fourth Amendment law supports our position that he can take steps to contain the situation. And when you see the escalation of the verbal hostility, you know that he's been hiding this phone. He hasn't been patted down yet. He did do the quick search. I mean, I guess the obvious question is what else has he got in his jacket pocket or his pants pocket. But he says, he points to the guy, and he says, get your hand out of your pocket. You can see on the video whether it's actually in the pocket, but it's clearly obscured by the jacket. And so we submit that that was a perceived danger, and it was reasonable for the officer to take those steps. So he was detained, but it was detained pending. Detained, not arrested. Detained, not arrested, but he continued to be detained while the search went underway. And then when this money was found, then he was placed under arrest. Well, what happened after? Okay, so the money was found, but what happened to the defendant? What additional steps? I believe it was when the officer stepped in. When did the arrest occur in your view? So, well, they told him that he was being arrested. It was when they went back to the car, switched the cuffs from the back to the front, which is what officers often do to make it a little more comfortable. But that's when he was told that they found a large amount of money and that he was under arrest for the suspicion of money laundering. And that was based not just on the amount of cash. I mean, we've talked about the $82,000 currency case. Just the amount of cash is not the only thing here. We also have this was concealed in this place that took tools, and it took some time. Like if you watch the whole video, you get an appreciation for sometimes the tedium that these officers go through because they're trying to wrestle with this lever and this lever and eventually getting tools to get it. But it was vacuum packed. It was double wrapped, which in their experience is often how contraband is hidden to avoid detection by drug dogs. And then also the dog twice alerted to the odor of contraband. And what the officer said later, you know, 45 minutes after the initial stop when he was decompressing and talking to the person on the phone, he did say that it was not a sit indication. But nevertheless, he said he was going after the odor of drugs. I've never seen Gus, the dog, go after, try to get into a car like that unless it's the odor of drugs. So he had no question in his mind, even 45 minutes later when he's decompressing, that Gus was indeed going after the odor of drugs. So in this court, in the Parada case, it said this circuit, we don't require the higher final indication. So it was enough for this officer to read his dog's behavior and see that it was an indication the dog was going after the odor. Isn't that a fact question, though? Could a jury say, we watched the video and we heard all of his comments minutes later and so forth, but we know that the first time the dog tried to get in, he didn't stop and say, I've got probable cause. And maybe the whistle slash command, whatever it was, we think that the trooper did direct because the dog didn't sit and that's what the dog's trained to do. If a jury said that, would we reverse that for sufficient evidence? I think that's enough in this case. The standard is whether it was objectively observable reaction, whether the dog's reaction was objectively observable. And I believe the district court got it right in everything that the court looked at, both the videotape and the officer did wait for the second. I mean, I think you should credit the officer for waiting for the second one before he called it and not calling the first one, but also his contemporaneous narration. He's talking about what he's seeing. He knows his dog. He says he knows his dog, and his dog only goes after the odor of drugs when he behaves that way. That sounds like a jury argument to me, and it's a reasonable one. And if you believe the officer is telling the truth and you rule that way or you find that way if you're the jury, but not every single time a trooper says, the dog didn't actually sit, but take my word for it, I think the dog was trying to get in the car. Not every single time is that true. And so why is the jury not allowed to decide that question? Well, I think in this case the district court correctly made that determination as a matter of law. We think it was correct, and it should not have gone to a jury. And I think that's based on everything that I've said, not just the videotape but also the narration. And on this videotape you do see the dog reacting, but we would stand on our briefing on this point, and we stand by the district court's analysis on that. In terms of the arrest, it's just whether there's a probability or a substantial chance. You don't have to show a prima facie showing. And even if it was mistaken, if it's objectively reasonable belief that probable cause existed, and we submit that it's at least arguable probable cause here for the arrest. Did it show a fair probability or a substantial chance, as some of the cases say, of criminal activity? The second time you said that about arguable probable cause, are you falling back on your alternative argument based on prompt to a qualified immunity? No, no. Well, arguable probable cause has, I mean, you either have probable cause or you don't. Arguable probable cause is a concept that's generally identified with prompt to a qualified immunity. Well, I believe there's adequate to show probable cause. But if it's a closer call, I think it's at least arguable probable cause. And we're not retreating or stepping back at all. But I believe when you take into account everything in this case, it was objectively reasonable for this officer, and it would have been objectively reasonable for any reasonable officer to conclude and believe that there was probable cause, based on everything, not just the money, but all the other stuff that I said. But we did make a clearly established argument, and if you look at pages 8 through 12 of the reply brief, I believe you see a lot of high-level generalities in their brief about this high-level stuff that the Supreme Court, again and again, has cautioned courts about. It has to be tethered to the particular circumstance. It has to be tethered. You've got to give something more than just general statements of law, like you can't arrest without probable cause. That's way too general. And so we submit that even if this court were to conclude on any stage of this encounter, that there was indeed a violation, that the plaintiff has not met his heavy burden to show that it was clearly established. Finally, on the DNA process, due process argument, we've argued in the brief that there was no freestanding right under the federal case law regarding the collection, storage, disposal of DNA. To the extent that the plaintiff bases their claim on state law entitlement, we submit that they haven't shown an entitlement. But the cases say that this entitlement, if it's entitlement only to a process, which is what they want, they want a process to ensure the process of the destruction of the DNA. And we submit that that's not enough for the state law to give rise to the procedural due process claim. Well, before you move on, could you help us understand the new law and how that affects this case? Yeah. I think maybe the new law is an example. I mean, I guess that would be the—I think that's ultimately the remedy, when you want a process for a process. You go through the—legislatively, you know, you get the votes and you pass the law. And so I think that that's what you do when the law, when a judicial remedy is not enough. And I think the district court correctly concluded here that the procedural due process doesn't allow the court to jump in here and give a plaintiff a process for a process. So I think this is maybe an example of the legislative process maybe plugging a gap that might have existed. Well, I think the question is, does it move this claim or not? And I assume it doesn't because she's asking for damages. Yeah, I don't know that we would necessarily argue that it was moved. It's harder, definitely harder in general cases, you know, when you're arguing for money. I don't know if you're familiar with it enough to say, would Mr. Hoskins be able at this point to get what he's seeking by using that new law? And if not, why not? Well, I guess I don't. I really don't know the answer to that under these facts. And I'd be happy to submit a supplemental letter if the court finds that that's dispositive. But I believe that the district court ruled in a way that lets this court affirm and confirm the district court having correctly concluded the procedural due process issue. But, again, we'd be happy to submit a supplemental letter if that would be helpful. We'll let you know if we require one. Thank you, Your Honor. So we stand by the district court's reasoning. We believe that there was no Fourth Amendment violation at any stage of this encounter. And if there are no further questions from the panel, we'll submit it. Thank you. Thank you, Your Honors. Sorry, Bob. I'll just hit you. Thank you. Just a couple of observations. I think we all agree that it is supposed to be an objectively observable hit with the dog. What we don't agree on is, is there only one way to interpret that video? And I think that's where we need to go back to the trial court and let this go through discovery, let us put our expert in there, which you don't do in a complaint. You don't attach your expert report. And also, what we heard and read in their brief and in the trial court's ruling was not really objective. It was all, oh, the officer, there was no question in the officer's mind. The officer was narrating what he supposedly saw, which, frankly, me think he doth protest too much. The officer is making a record. I think a jury could conclude that. So there's a dispute of historical fact here, and that's why summary judgment is not appropriate. What about his alternative argument on prompt to a qualified immunity? Even viewing the evidence favorably to you, can we say that, would we affirm based on prompt two? I don't think so, because remember, if we went on the dog and it goes back, right, then what we have then is an officer who is fabricating evidence because he is fabricating the dog hit. And we did cite case law. It's been established since Pierce versus Bailiff. Can we really say that only a plainly incompetent officer would have attributed this as an alert? No. The actual question would be, if the officer knows his dog did not alert and then gave the dog a new signal or code to make the dog go into the window, could a reasonable officer think that's legit? No. So that needs to be decided by the trial court. But there was one thing I really wanted to follow up with on Judge Ide's question, and that is what changed between being told, I mean, it's the classic. You're not arrested. I'm just detaining you. Right? That's what they try to say. Here, nothing changed after he was supposedly arrested, except that he was told now that he was arrested. He was still handcuffed, had a gun pointed at him, was still locked in the car, and I am out of time. I'll do one. I took as much time as I could. Oh, okay. Thank you. Just finish your answer. Every single thing that had happened to him up to that point and that he was still experiencing continued without any change except that he stayed in the car even longer in the handcuffs. So detained or arrested, that's another issue that the trial court, we should be able to work through at the trial court. Thank you. Okay. All right. Thank you. Okay. Thank you. All right. Counsel for both sides did a very good job in your briefs.